I see two main issues that I wish to address on this. Of the three, the sentencing is something that I'm not going to go into unless you prefer because the first issues are the conviction. And in all fairness in this case, the timing of it when I received it and read the transcript was impressive. In light of BART code, it came to me right about the time that BART code came out. I would not argue that this is as egregious as BART code, but the result is egregious in this matter. What we have here is a case, obviously, and I think both sides have agreed to this, where we had some complications among the attorneys because it was the second time the case was tried. But the law is and the rule is that the evidence presented to jury is that which comes from the witness stand and is presented either as physical or testimonial evidence. The fact is that Mr. Fields was at a residence for only a few moments. We don't know if he entered or not, but it was obviously a residence that he had some connection to because personal items were located inside. But the crux of this is that the law enforcement officers had no knowledge of him. They see him, they approach, he throws something, and all of a sudden he's at trial. This is a matter where the government, and I'm not saying just the prosecutors, Your Honors, but it was a poorly investigated, poorly prepared and presented case. Was Mr. Fields, did he have knowledge or proof there that he had knowledge of this conspiracy or of the narcotics involved in the conspiracy? And it is absolutely lacking. The government hangs on the fact that when the... Just to be clear, we're talking about the conspiracy. The cons... Very lacking on a conspiracy, not on possession, which I guess you won't address next, but conspiracy is really the one you're honing in on now. That's a larger one, but Your Honor, I would also argue that it's lacking on the possession. I'm speaking with a conspiracy right now. Okay, I shall do that. Very well. The evidence presented at trial was that the, and even in the briefs, is it one, two, three, four, five different people were well tied into a conspiracy. That is, they get the lowest denominator who's buying small amounts of resource. Very simple, very straightforward for a narcotics offense or conspiracy case. And most of those individuals made statements, whether by recordings, undercover recordings or in debriefs, acknowledging their role. Not one of them mentioned Mr. Fields. Not one included him in the conspiracy. During the trial, they called one witness, Mr. Ballard, who talked about how he brought narcotics, the approximately two kilograms of cocaine, to Bailey's house. But even he would not and did not say how Mr. Fields came to the house, why he came to the house, what his purpose was in going to the house. And so to show the knowledge, the record is bereft. There was no evidence properly admitted that tied Mr. Fields into the drug conspiracy. Obviously, if his personal items are located in Bailey's house, that's one thing. But because two people are using a house or one lives there and one is storing things there or periodically visits does not mean they have knowledge of the conspiracy and that there has been an agreement. I know on narcotics cases, there doesn't have to be an agreement, but knowledge and some form of consent to that conspiracy. It is completely lacking. Now, the critical evidence in the first trial is you have evidence that Lewis is his cousin. Yes. That does not come out in the second trial. Does not come out except... For purposes of the trial wherein he was convicted, all you have truthfully and Ballard's testimony can in some way be disregarded. What the evidence was, was police officers are going to go over and do a search of Bailey's residence. They see my client pull up in his car, go toward the door, which they could not... I mean, they admitted they couldn't tell whether he was there or not. They say, well, he's in his pajamas with big guns come at him. His eyes pop and he throws something. He turns around, walk back to a fence and he throws something. Then he turns around cavalierly as though, what can I do for you gentlemen? Well, I'm not sure if it was cavalierly. Well, that's my term. That's sort of the way it reads. In the middle of the night, late at night walking toward a bunch of men in squad outfits, I'm not sure how cavalier anybody could be. Turn around pretty calmly, back to him. And so he went to... He didn't run, which typically the instruction would be, well, that's evidence of guilt. He'd not run. He approached them. And into that, and this is what ties into the possession charge, is that he threw something at no point in time, nowhere in the record is there anything that addresses what it was he threw. He threw something, but the negative, the things that would show that those packages which they retrieved were the only things in that backyard. It was near a little garbage can. No fingerprints, no testimony about what else might have been out in that backyard. Even if they had managed to bring into evidence the fact that there were no other packages on the ground, so by inference or looking at the totality of the circumstances, had to be that cocaine. It's just, we went, we picked up two packages, it's his. That goes to the weight of the evidence, doesn't it? It does, Your Honor. And I haven't been convicted. What's our review of that now? All inferences are in favor of whom? The state. Excuse me, the government. In the light, most favorable. That goes to the weight, doesn't it? How do you get around that? How do we get around that? If you see someone throw something that looks dark, over a fence, the police officer goes there directly after that and finds drugs, that's not a reasonable inference, in terms of the fact that what he threw was drugs? In terms of our review now? It may be, Your Honor, but I think it also goes to the sufficiency, and I think it ties into how we get to the additional evidence about his cousin being involved in the narcotics trafficking. That is, if it was sufficient enough, then there is no need to discuss Emmanuel Lewis. There is no need to argue about Emmanuel Lewis. If this evidence from the officers was sufficient, he threw, we went out there and we picked something up from a fairly large backyard, and that's sufficient, then Emmanuel Lewis didn't have to come in. But lacking proper, as I always put it, crossing of Ts and dotting of Is to tie those packages in to the defendant, there's that extra step that was made by the government, and that extra step was, oh, well . . . They have to tie it to the conspiracy somehow. They can't just tie it to the defendant. The government has to then connect your client to the conspiracy somehow. Exactly, and they couldn't. They were unable to do that. What about the similarities in the packaging of the drugs they found in those marks that are used by the conspiracy to mark their drug? That's an issue, Your Honor, and I have to conceive . . . That's an issue. That's a fact. Yes, and that's an issue against my client, the similarity in the packaging. And also, what about the nature of the personal items of his found? How many people leave their uncashed payroll checks in someone else's garage? I believe in a garbage bag, Your Honor. In a garage. Right. Well, sometimes when people are in transit, they store personal items in somebody else's. Oh, so you think it means he actually lived there then? I didn't say that. That seems stronger. I said that he . . . No, yes, you did. With all due respect, no, I said he's storing things there, as in . . . You said, well, sometimes when people move around, they . . . Correct. So they once lived there, right? Pardon me? They once lived there, you're saying? They move around? No, what I'm saying, Your Honor, is that sometimes people don't have a place to live. They take their personal items. They store them in somebody else's garage or whatever. Was there evidence of that? No, there's no evidence as to how it was there. Nothing in the record. That's what I'm saying, but this nomadic thing you're bringing in, that would be all the whole cloth now at this point, wouldn't it? Wouldn't it? I . . . I know you're doing your job for your client, but . . . I understand, Your Honor, but I don't think so. People store things in other people's homes when relatives or friends . . . That is true. People do store, but . . . They do. But uncashed payroll checks. Uncashed payroll checks. In a bag. Yeah, and it kind of augurs against being nomadic because you have so much money you don't even cash the checks that you already do or had been written to you. And I cannot explain why my client had those there, but perhaps he didn't need that money. He may have . . . There are any number, but I'm just saying that you do have to look at the nature of the personal items. It wasn't like . . . Yes. Just, I mean, like a ring was there. Maybe I dropped it or something like that. Yes, but personal clothing hanging in a closet, that wasn't there. Deodorant, razors, toothbrushes, all of those things. Bills were not there that were . . . What about his lawyer? In the mail? What about the lawyer himself argued that, well, just because you're related to somebody doesn't mean that you have a relationship. Didn't his lawyer argue that? I believe he did, Your Honor, and yes, I absolutely agree. The relationship . . . Isn't that waiver? Pardon me? Even if it was wrong for the government to introduce it, isn't that waiver when you take it up the mantle yourself and say, yeah, well, just because you're related to somebody doesn't mean you're in a conspiracy with them. He conceded that, and he hasn't waived it? I think once it was argued and the cat was out of the bag that counsel for the defendant did the very best he could to try to minimize the damage. Was there a motion for mistrial? There was no motion for mistrial, Your Honor. Well, that's not the best you can do though, is it? There was no objection, Your Honor. That's not necessarily the best you could do under those circumstances when it came in errantly by the government, correct? Is that right? I would have to concede that, Your Honor. You're absolutely correct. All right. Go ahead. The problem there is in the first trial there was evidence of a relationship. The second trial, nothing was introduced. There was no evidence. Regardless of who argued it, there was no evidence he was related to this individual. Correct. Even in determined sufficiency, the evidence is not there. It may be an argument, but not an evidence . . . Correct. . . . to support that part. We talked about a conspiracy, which is one prominence, but now this possession deal. I mean, we've had . . . I know there's an unpublished case we've had here. What is it? Maybe I pronounced it wrong. Seseer was a case we had in which the defendant was jumping over a fence or something like that. Then they found a bag later on. We tied him to it and said he's guilty of possession. Your guy goes and several witnesses sees him throw a package, some say one, two, I don't know what they find, two, whatever, but they throw something and he turns around. How can we distinguish if we . . . and I know unpublished is not precedential, but it's guidance and it's our court. How can we distinguish that case? One thing . . . . . . on possession. One thing, my client did not flee, Your Honor. He turned around and then approached the officers, put his hands up, obeyed all orders from the officers. But he didn't just come out of the house and hold his hands up. No. He turned around. He may not have run. He walked away from them. He saw them. He walked away from them intentionally. Then once he had discarded whatever he did, then he turns around. That's a little different. There's no need to run if you don't have everything in your hand. Or something else to tie you to it. Maybe he made that determination. That's probably pretty smart. You've got a bunch of SWAT team members out there. That's not a good idea to run. He's been in the neighborhood a little bit. I agree, Your Honor. But it was night. It was from a distance. They don't know how much he saw of them or what he saw. It is clear the witnesses saw him throw something over that fence. It is clear that cocaine was found on the other side of that fence in a package. I'm just saying to distinguish that from the Saseer case is difficult because in that case, the defendant was climbing over a fence. He left from there. Then they found his package. No one said they saw him throw anything. It was just there. He was found guilty of that on appeal. Perhaps so. What I'm . . . Possession. Right. Counsel. You want to respond to Judge Warehoff. Your time is up. You can just . . . What about this? If, in fact, the evidence is sufficient for the possession and you're correct that the evidence was not sufficient for the conspiracy, is it harmless? Because in terms of sentencing, didn't he get the same thing and it just ran concurrently? It would be harmless. Because he'd get the same sentence on possessions he got for the conspiracy. Only if the possession stated a quantity, and I'm drawing a blank right now, I would assume that it did state a quantity of narcotics involved to set the mandatory minimum. If that were the case, that is true. If I may, I'm out of time at this moment. Yes. Thank you. Thank you so much. Mr. Rogers. Good morning. May it please the Court. My name is Joshua Rogers and I represent the United States. At the outset, we do want to make something clear. There is no question that it was inappropriate for the special AUSA in this case to argue facts that were not in the record. The United States Attorney takes this very seriously and we are not here to defend that aspect of the prosecution. And that fact that was not in the record was? That the defendant and Emmanuel Lewis were cousins. We do think it is appropriate, however, to defend the validity of the jury's verdict. And we're confident in doing that because when those comments made by the prosecutor are viewed within the totality of the record, there's no question the defendant was fairly tried. I do think it's important to note at the beginning that even if this court were to vacate the conspiracy conviction, it is accurate that the district court only held the defendant accountable for the amount he personally handled on the night he was arrested. And the district court said that this sentence is only for the amount you held in possession. I guess I'm trying to understand the harmless aspect of it. If a court . . . you're going to assume if a court has two convictions, it's going to give a sentence, but if you only have one and you can get that same sentence for that one, then it's harmless. In this case, it would be because at the request of defense counsel, the court responded by lowering defendant two levels after he only held defendant liable for the amount that was thrown over the fence. So that was the amount he personally distributed. I do think it's important to first begin by addressing the sufficiency of the evidence because it provides a backdrop for judging the impact of the prosecutor's statements during closing . . . With regard to which charge? With regard to the conspiracy charge. I think it's a really hard sell that defendant did not distribute. So I'll move on to conspiracy because that seems to be where the crux of some of these issues are. There are three central players here. First of all, we have Bailey. Then we have Ballard. Then we have defendant. Bailey . . . None of the rest of them know defendant. We don't have that in the record. No evidence that any of them knew anything about him. We do know . . . No testimony from any of the co-conspirators that they had any knowledge of an agreement to a conspiracy. So none of those other witnesses tie him in. They don't. We do . . . You don't have the evidence that he's the cousin of one of those other ones because you didn't do that the second time around. So what you got is a defendant who's in the front yard. He comes out, goes up the house. You don't know if he goes in or not. And he sees the squad. He turns around, walks back, throws something. Everybody says he threw something. And he turns around and says, okay, what is it? Or something to that effect. And you say that's a conspiracy. We don't say that that's a conspiracy. What we need to do is . . . What else? What other evidence do you have beyond that to show conspiracy? It's important to start with Bailey and ask, who is Bailey? He is at the top of a drug distribution chain. Nobody's arguing that. And he resides in a stash house. We know it's a stash house because officers had information from at least 18 months that he had large quantities of drugs in that garage. He also has other . . . including firearm, ammo, cell phones. But most importantly, he has a food vacuum sealing appliance that's used to mask the scent of drugs. And he has food saver bags that have a diamond-like pattern on them. And it's very unique. Then, that leaves us . . . How is it unique? You can only get them . . . you can't get these certain bags in, you know, just any grocery store? What makes it unique in this case is that everybody seems to be able to recognize, that's the bag. Whether or not it's . . . you can't get it in a grocery store, that's not in the record. But we do know . . . What do you mean, that's the bag? When people were asked, do you recognize this bag? The officer said, that appears to be the same bag that we saw at Ballard's house. When Ballard's asked, do you recognize this bag? He says, this looks like the same bag I used. How different to say, that appears to be the bag we saw there, as in saying, that's the bag? Well, I'm sorry, Your Honor. The more accurate interpretation of what they were saying was, these appear to be the same type of plastic that are being used. That ties in with Judge Thacker's question. So, we have these food saver bags that look particular, and that leaves Ballard indefendent. And if we want to figure out how their role ties in, we have to look at the events of August 20th through 22nd. What happens on August 20th? Ballard goes to Hartley Bailey's house. He walks out with three kilos of cocaine. It's vacuum sealed in this particular wrapping. He carries it, as instructed by Bailey, at his midsection. And the intent is for him to deliver two kilos and then sell one. But he brings it back to Bailey, because he's unable to locate the person that he was supposed to deliver it to, and he also discovers that when he tries to cook it, it's low quality. What happens the very next day? Defendant shows up. He goes to this stash house.  It's vacuum sealed in this same patterned plastic. He carries it at his midsection, the same way that Ballard said he was instructed to carry it. I'm not sure how else you would carry that. I mean, does somebody have to instruct you that you would conceal it in that manner? Apparently. I certainly would conceal it if I was carrying that. What we know from Ballard is that Bailey did give instructions. He was in a position to tell him where you ought, how you ought to... And Ballard was part of the conspiracy? Yes, Your Honor. And nobody testified that Mr. Fields was part of the conspiracy, correct? He did not testify that he was part of the conspiracy, but he did provide evidence that indicated that he was. And there was evidence and other indicia of drug dealing in Mr. Bailey's house, and you listed it. One thing you left out was that there was a tally sheet for the drug deals in Mr. Bailey's house. And, of course, Ballard's name was on it because he was part of the conspiracy. Was Mr. Fields' name on it? It was not on there. What we do know, though, as he goes outside, he looks, officers begin repeatedly, all of them are saying, stand down, and giving him verbal challenges. And what does the defendant do? He turns around and briskly walks to the corner of the house, reaches for his midsection, and some dark object flies over the privacy fence. And when officers look, they find 1.6 kilos of cocaine that's in a rectangular shape. And what do you know? It fits perfectly in a shoebox top in Bailey's home. Well, you know, when you get down traditionally the legal definition of conspiracy, there ought to be something to show an agreement or something. In the drug world, as you know, we've done a lot to, we meaning the whole system, to make it really very, not so difficult to prove those things. But this is really bare bones. You started out by, candidly, and I give you credit for that, sort of acknowledging this is not exactly something that's on all fours here. And it just sort of fits. You really have to string a lot of stuff together to get to where we are in this case. The possession charge, I mean, we've got this unpublished case. I'm not sure what that means. I mean, you throw something over the fence. It really is tenuous. But there's the timing of it. There's the coming out of the house. There's some other inferences. And it seems to take on a different posture. So it seems to me, if you're telling me that possession, he's going to get the same sentence, what would you lose by simply saying, okay, possession, go for it, let's go for that. Beyond a conspiracy. I know that takes a lot to say that, but at the end of the day, it sounds like the same result happens. He's going to stay in jail for the same amount of time if this harmless error possibility, even if we send it back, the likelihood he's going to get the same sentence. If possession is there. If possession is there. Well, the reason why we are not making that argument is because it doesn't comport with the standard of review. And that is, viewed in the light most favorable to the United States, was there substantial evidence to support the verdict? What you have is substantial inferences. And the evidence itself is lacking in many respects in terms of the agreement. Yeah, what you have is something that looks bad. And if someone wanted to find it, even a jury the first time around couldn't reach a verdict on it. So then you go back, and for some reason you don't tie in Emmanuel Lewis. I grant you, if you put Emmanuel Lewis as cousin, you might have a stronger case on that. But you didn't do that. That had to have been a fatal error, or at least a critical error, not to tie him in in that manner. Other than to say, he walks out of the house, he's got something that looks like it's cocaine, nobody knows him, never heard of him, no one testifies that he knows him, and he's got a package that looks like the package in there. Therefore, conspiracy. Well, again, as we've walked through, this is not just, he walked out and he happens to have a package. He's doing something very similar to Ballard the day after. There are connections between these two exports of the drug from the home. And, again, this court has stated, he's not required to be related to anybody. He's not even required to know these people well. The court has stated that there has to be a tacit agreement or a mutual understanding. There needs to be a slight connection between the defendant and the conspiracy. If he only has a minor role, that's enough. Very uncomfortable when we get into this slight connection stuff. I mean, we don't do this in any other kinds of cases. I mean, this conspiracy thing, there's a limit. There has to be a limit in terms of where you go with that. I would think what would make the court more comfortable is when we look at the evidence that demonstrates a relationship between the defendant and Bailey that predates the arrest. And that is, again, there's a blank personal check in Bailey's bathroom. There are two five-month-old uncashed checks that are worth $1,000 in the garage where the drugs are kept. And there's trust here. You don't just walk away with 8,000 dosage units of cocaine, which can be turned into 16,000 crack rocks, without having some relationship of trust. This isn't somebody who just randomly walked up and said, I would like to be a drug entrepreneur. I think I'm going to walk away with this much. Their estimate... One of them downed crack cocaine, as it was, the other? It doesn't sound like he could have turned that into any crack. Either way, the estimate at trial was that it was worth $100,000 to $150,000. Someone's not going to walk away if they don't have a long-standing relationship of trust. And, in fact, we know from the defendant's own brother that they had a prior relationship, so that's uncontested. And now, with regard to Ballard, these two do know each other. We look at that scene at the transport van. It's actually very critical to look at those facts. It tells us a lot. Defendant is in there with three other co-conspirators. And who does he direct his attention to? Ballard. He looks at Ballard, puts his fingers to his lips, and says, keep it hushed. He says, I was at Bailey's house. And then he shares his alibi. After saying, look, I realize it's essentially acknowledging it's risky because maybe I'm under surveillance. We may have video or audio, so be careful. What does it tell us? He knows and recognizes Ballard. He's comfortable talking to him about the crime that he's committed. He wants Ballard to keep quiet about something. And Ballard knows something that would contradict his alibi, so it's important for him to tell him. What we have here is when we take these three... We have to use post-arrest evidence to show the existence of a possible agreement based upon indication that he knows the individual. I mean, oftentimes we use defendant's admissions in jailhouses where they tell someone, I was involved. This isn't exactly that, but what it is, is this idea that... Conspiracy is an inquiry crime. I mean, it's a different sort of crime in some sort of a way. I mean, you've got the possession, but conspiracy sort of... I mean, there's a little more here than using jailhouse testimony to say you committed a murder or you did something else. Well, the idea that defendant has no connection to Ballard, that this is just some new relationship and that we don't know anything about it, it just doesn't comport with what happens in that van. Where's the J... What's the joint appendix like to what you were just reading? I will look that up for the court, and I will have it to you before this argument is over. When we take these three relationships and consider the events of August 20 through 22, we can't help but conclude that the evidence was sufficient to establish the defendant had much more than the slight connection that's required. If the court could give me just one moment, I will actually... This was at J.A. 1, 33, and 34, and actually it ends at 35. I do want to note something. In my recitation of the facts of why the United States' evidence was sufficient, there was no mention of Emanuel Lewis. I didn't need to mention Emanuel Lewis. We could establish our case without him, and it underscores the fact that when the special AUSA did that during closing argument, yes, it was inappropriate, but it was not even necessary, and it didn't rob the defendant of a fair trial. Now, with regard to the two-part test, first of all, the comments have to be improper. We've stated they were improper. There's no excuse for them. Second of all, though, it has to so prejudice defendant's substantial rights that it denies him a fair trial, and based on the six factors that are considered under that, that just didn't happen here. The third factor is the strength of the evidence, absent the remarks. We basically just walked through that, and we do believe that the evidence could stand alone without the remarks. But you must admit, Mr. Rogers, it's somewhat thin. You have evidence, but it's thin as to the conspiracy, to some degree, because, one, you can't establish that he... We have full circuit precedent about this, and Judge Wynn is correct. When it comes to conspiracy and drugs, the Fourth Circuit has made that... The burden is not as hard for the government as you would think it might be, but you can't show in this evidence that he got the drugs on credit. You don't know if he paid for them or not, because you don't know what he had with him when he came to the house. He could have had the street value, the going price of the drugs with him. A lot of times, you see, the Fourth Circuit said, well, if you are getting drugs on credit, then that's evidence of a conspiracy. But here, you can't establish that. You agree, correct? You don't know if he paid cash money for those drugs or not, do you? A lot of the context is missing, yes, Your Honor. Yeah, but you don't know that. So, therefore, what you've shown is that, at best, is that he possessed those drugs, and he purchased them from a stash house, and it would be consistent to have markings on it like that stash house, because that's what he bought it from. That doesn't prove conspiracy. It just means that, you know, you go to a store, and the store's name is on what you purchased because that's the store. You went to their store. So, that's not consistent with conspiracy. That's just the item. So, that's what I'm saying. What did you have? And your main witness didn't tie him. So, I'm going back to now that the whole idea, you have to admit, is still thin as the conspiracy aspect of it. And then when you throw in three times mentioning, well, you know, Mr. Lewis is his cousin. Oh, did I mention that that's his cousin? Oh, I think I forgot. That is his cousin. Three times. It was very deliberate and very strategic in a thin case like this, and we can't just, that's a stubborn fact that just doesn't go away because you want it to go away. It's pretty serious, don't you think? I do believe that if you take facts from this case and view them in isolation, because, you know, this was not the perfect prosecution. We certainly could have provided more context. When you isolate them and look at them in a vacuum, you don't have to isolate very many facts to go, wow, this isn't the best case ever. However, viewed in the totality, the jury was able to look at this and say, we see enough overlap between a stash house and what happened on August 20th, 21st, and 22nd. And, not only that, the conversation between Ballard and the relationship that was obvious between Defendant and Bailey, the one who was residing in the stash house, that there was something more here, and it was enough for them to determine that there was at least more than a slight connection between Defendant and this conspiracy. In your evidence to establish that it was a stash house, didn't you tell the jury that you saw people during that period of observation buying drugs from there? That location? I know that we established that with Ballard. You just say it was a stash house, all warehouse, no retail? What we did have evidence of was that for at least 18 months, there have been large amounts of drugs stored in the garage. That we did know. And we know from Ballard and Defendant that those drugs are being exported from there for sale. This court has stated in Fisher that intent to distribute can be inferred from possession of a quantity of drugs larger than needed for personal use. Nobody's arguing that he didn't intend to take 8,000 dosage units of cocaine and do something other than use them himself. That itself does not a conspiracy make, though. For his own enterprise, for example, yeah, I bought enough for me to sell to somebody else, but that doesn't make it a conspiracy, does it? No, it doesn't. That alone doesn't. Again, we don't view these things in a vacuum. That's why we do the helicopter view over all of this, and we have to ask ourselves, did the jury have enough there that with substantial evidence viewed in the light most favorable to the United States to support that verdict? And in light of that standard, we would say that they did. And with regard to those comments being brought up, it is worth noting that defense counsel did not jump out of his seat any one of these three times. If this was so earth-shattering, we would think that he would have thought, my goodness, this didn't come in in this trial. This would have been, you know, a gold mine for him. But instead, he stays quiet. And so nobody objects, and no curative instruction is given. However, the court and the special AUSA strongly admonish the jury, you should not consider these statements as fact. And unless the court wants to assume the jury disregarded that admonition, then we have to believe that it effectively operated as a curative instruction for those facts that did come in. And it wasn't a no instruction requested to say not only should you not consider it as fact, in fact, there was no evidence of any relationship at all to the defendant or that person. No one asked for that? No, Your Honor. Well, see, that would be the curative instruction. It would, but our argument is that this would have effectively operated as a curative instruction. And with respect to the statement that the court had made that the statements were made strategically, we do believe it was deliberate, but we do not believe it was done in bad faith. We have had an opportunity to speak with the special AUSA. We asked for the explanation for what happened. Speaking kind of in a third person, I need to be more specific. We do believe it was deliberate. In other words, what we did was deliberate. That is to say this improper statement, this evidence not in how many times? Three. Three different times. Yes, Your Honor. If you're going to look at it in context, you did that in the first trial when it was in evidence, and you got a there was no verdict. Or if you count the argument at the Rule 29 motion to the court. That's correct, but I do want to make something clear. There was a hung jury. It wasn't. We didn't get a... No verdict came from it. You had a hung jury with that evidence. Correct. Properly in. Now you don't have that evidence, and it's done three times in the context of what we discussed earlier, a very close case when we talk about the conspiracy of it. Here it's used over and over again in a prosecutor's closing argument, and you say we believe it was deliberate. It was deliberate, but not done in bad faith. There's only one conclusion to make. It's said three. If you want to count four times, we're not going to stand here and say that wasn't deliberate. And again, I do see my time is up. We're also not going to stand here and say it wasn't inappropriate. It was inappropriate. We apologize to the court for it, but at the same time, we do believe the defendant got a fair trial, and if there are no further questions, I'll take my seat. Thank you, Mr. Rogers. Ms. Darrow, you have some time left. Thank you, Your Honors. One thing I must point out in regard to the charge of the possession with intent to possession of more than 500 grams, if you look back, there is a hung jury on both of those counts the first time it went to trial. So to say, well, all right, the conspiracy is lacking adequate evidence, or we can throw the conspiracy out, but regardless of everything else, the possession is still there, I don't think that can easily be argued in light of the statements made at the time of the Rule 29 and, more importantly, in front of the jury. The Rule 29 is not the biggest issue, except that you already had a judge with many years' experience saying, this is mighty thin. Mighty thin. And when that happens, that fits in and supports the jury initially saying, the first jury saying, we can't come to a conclusion. When you take those statements, the arguments  the assistant U.S. attorney, by the government, in closing, we can't hold them and attribute them only to the conspiracy charge. It's one package. We don't know how that fit in with how the jury deliberated in regard to the conspiracy and or the possession charge. It may be that the jury said, well, if he's guilty on one, he has to be guilty on the other. You didn't need the cousin in order to establish the possession. I mean, the cousin, the business of being related to Emmanuel Lewis and the facts that would establish the possession, you didn't need that, did you? I mean, it seems to me, one fact that seems like to me has just not been hit on, maybe I'm just thinking it would be, I thought all the witnesses, he threw one package and they found two. Right. There was one throwing motion. Two packages are found. Was it one motion or one packet they saw? That's critical. I think if the witnesses, depending on what the witnesses, I think they said they saw one package. Of course, it's dark outside, so I don't know. It's dark, and the officers were across the street and down another house or so. There's no evidence of them using night vision glasses or anything to that effect. And again, it's going back to the, you know, it could have been a joint. It could have been Cuban cigars. Were these packages found next to each other, or were they found in different spots? That's not in the record. They were found near a garbage can, but as to whether they were both side-by-side or in different directions, it's not in the record. From a defendant's perspective, if someone says, and all of them say, we saw him throw one item, if you found two items out there, it would be somewhat material if one is not near the other. It would indicate somebody's been doing this otherwise. That is correct. That's almost a defense piece of evidence that you want to bring out. I'm not trying to move this forward, but it seems like to me, I don't know what we pulled from that. I think the evidence was that one was black, the other one was a clear color. It might explain not being able to see the second one. Right. That's what causes the problem with the possession. How much did he possess? Did he possess both of those, or one of those? Did he possess 600 grams, or did he possess close to 1,000 grams, or 900 plus grams in the other package? That we do not know. Again, going back to what I said, there's just a lack of sufficient evidence, and the tainting by virtue of the statement about the cousin is what helps put that all back on the defendant. It's a carryover. To say, well, that erroneous statement only applies to the conspiracy is not looking at the full brunt and argument of a trial and presentation of a trial. But it does, unfortunately, because we're looking at it through the lens of sufficiency. Correct. The conspiracy would be, for example, if we ruled that would be that we found the evidence lacking in sufficiency. But then we look at the possession distribution, we're looking at it through the lens of sufficiency. You're sort of mixing apples and oranges. There's a tipping aspect because they errantly mention this, but for sufficiency, we're really looking at whether or not it was sufficient evidence, and clearly as an element, consanguinity with Lewis has nothing to do with possession nor distribution. That is correct, Your Honors. And if we find that the evidence was not sufficient on the conspiracy, but that it was sufficient on the possession with intent, what is your response to whether that was harmless or not? I still say it was not harmless error because there was insufficient evidence even for the possession. You have one man walking out of a house making a... I'm sorry. Assume we were to find there was sufficient evidence on the possession, but there is not on the conspiracy. Then what is your response as to whether it was harmless or not? You have to assume we find the conviction on the possession should stand. The sentence is the same. And then the question is was the argument harmless or not? And my position would be it's still not. At what point in time can the government keep saying, well, it was an error, and to say, well, it wasn't the perfect prosecution. But this had many flaws. And the largest one was the one wherein evidence outside the record was argued to support a conviction. And it was not used to support just the conspiracy. It was used to support both convictions. And once that happens, then both fail. But the analysis, though, what we have is, though, this is plain error review. Yes. So how do we get this substantial right prong of plain error in terms of since that evidence had nothing to do with the elements which were the base of the conviction for possession with intent to distribute? How do you meet that prong of Milano? Because it was not presented to the jury in that matter. In that manner or in that matter. It was all in globo. It was all presented as one package. Well, both counts were tried together, but I don't think you can say it's a conglomerate. They just tried two counts together. Evidence stands for itself and we look at sufficiency and it is demarcated for purposes of elements for each count. That's why we could look at it very carefully and say, no, it wasn't sufficient as a conspiracy, but it was perhaps as to possession. But that conglomerate does not leave us bereft of being able to extract them for elements. You still have to prove that a substantial right was involved for Milano. This is plain error in a sense. You really don't have a real clear harmless error aspect because no one objected to it. It's plain error. I'm out of time, Your Honor. I know, but I'll let you maybe you don't want to respond to that, but if you would like to, you may, but if not, we thank you so much. I've never missed an opportunity to respond. I thought that would be the case. But legally looking at it, I understand what you're saying. Without the objection, it makes it harder, but when we look and know there was a prior trial and the jury had the same issue with both counts and said, we can't reach a resolution. When you look at the closing arguments and it's argued in toto, then you can't parse it out. I think that would be an injustice and it would be plain error. I thank you. Ms. Darrow, we note that you're a court opponent and we just want to make a special thank you for that because without your help in taking cases like this, our court could not do our job and we really appreciate that. It's a great service to this court and to the people of the United States. Mr. Rogers, thank you for ably representing the United States. We'll come down to Greek Council if you want a break. Thank you, Your Honor. We're going to take a brief recess after we This honorable court will take a brief recess.
judges: Roger L. Gregory, James A. Wynn, Jr., Stephanie D. Thacker